# EXHIBIT A

## **AFFIDAVIT OF DEA TASK FORCE OFFICER SHAUN T. SANTOS**

I, Shaun T. Santos, being duly sworn, depose and state:

### **I. INTRODUCTION AND AGENT BACKGROUND**

1. I am a Sergeant with the Lowell Police Department and assigned to the Drug Enforcement Administration ("DEA") Financial Investigations Team. Among other things, I am responsible for conducting investigations involving transnational criminal organizations, including investigations into violations of federal drug laws and laws prohibiting money laundering. I have been a police officer for over twenty-five years, and I have spent the majority of the last eighteen years assigned to the Drug Enforcement Administration, as a Task-Force Officer.

2. I submit this affidavit in support of a Verified Complaint for Forfeiture *in Rem* against the following:

> $307,000 in United States currency seized on September 27, 2017, from Vyrack Sok Chhem, on Interstate 93 North, south of Exit 37, in Woburn, Massachusetts;

(hereinafter, the "Currency"). As set forth herein, probable cause exists to believe the Currency is subject to forfeiture to the United States pursuant to Title 21, United States Code, Section 881(a)(6), because it represents moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of Title 21, United States Code, Sections 841, and/or 846; and/or represents proceeds traceable to an exchange in violation of Title 21, United States Code, Sections 841, and/or 846, and/or represent all moneys, negotiable instruments, and securities used or intended to be used to facilitate violations of Title 21, United States Code, Sections 841, and/or 846.

3.	My education includes a Bachelor of Science Degree in Criminal Justice from the University of Massachusetts in Lowell, Massachusetts, a Masters Degree in Criminal Justice from Anna Maria College in Paxton, Massachusetts and a Juris Doctorate Degree from Suffolk University Law School, Boston, Massachusetts.

4.	I have attended multiple Department of Justice (Asset Forfeiture and Money Laundering Section - AFMLS)[1] and DEA sponsored trainings involving asset forfeiture and money laundering. These trainings outlined the standards and the methodologies utilized by narcotics traffickers to attempt to move illicit drug proceeds into legitimate financial and business markets. The AFMLS and DEA sponsored trainings identified the three major components of money laundering techniques as placement, layering and integration. The placement stage, the initial stage where illicit drug proceeds are attempting to enter into legitimate financial markets, are when these illicit proceeds are most vulnerable to identification and seizure by law enforcement. The layering stage is where illicit proceeds after initial placement are utilized to conduct some type of financial transaction or purchase. The layering stage can encompass multiple transactions. The integration stage occurs when illicit funds have been successfully transacted into mainstream commerce, usually through multiple financial or business transactions making it extremely difficult for law enforcement to identify and track illicit proceeds.

5.	From 2005 to the present I have been an annual guest lecturer at Suffolk University Law School's Police/Prosecutor clinic. In 2010, I was a guest lecturer at Suffolk University Law School's expert witness evidence seminar, regarding expert drug witness testimony. Since approximately 2009, I have authored or co-authored several manuals for use by law enforcement officers that are nationally distributed by the Public Agency Training Council

---

[1] AFMLS is now the Money Laundering and Asset Recovery Section ("MLARS").

as materials utilized for training programs throughout the United States. One of these training manuals highlights best practices for conducting drug/narcotics investigations. I have additionally produced training materials used by law enforcement attendees at multiple Drug Enforcement Administration sponsored trainings throughout New England. These trainings specifically included drafting affidavits in support of search and arrest warrants, as well as the operational aspects of the execution of search and arrest warrants.

6. I have been the featured speaker at multiple law enforcement conferences regarding legal updates and law enforcement best practices to include, 2009 Georgia Sheriff's Association, 2010 Ohio Narcotic Officer's Annual Conference, 2015 Little Rock, Arkansas Municipal League of Attorney's, 2016 Michigan State Police Upper Peninsula conference and the 2017 Buckeye State Sheriff's Association Regional conference. Since 2009, I have conducted numerous training sessions for law enforcement officers, attorneys, city officials, insurance industry executives, risk management executives, and other law enforcement trainers.

7. During my employment as a law enforcement officer, I have submitted affidavits in conjunction with applications for numerous criminal complaints, search warrants, Mutual Legal Assistance Treaties (MLAT's), Letters of Rogatory and INTERPOL notices. I have participated in the execution of numerous federal search and arrest warrants in such investigations. I have debriefed over one hundred confidential informants. Many of these investigations involved the utilization of anonymous tips, controlled purchases of narcotics, recording devices, surveillances and the preparation of law enforcement reports documenting these activities. I am well acquainted with the methods, practices, and vernacular utilized by both large scale narcotic traffickers and their associated money launderers.

8. This affidavit is based upon information supplied to me by other law enforcement

officers, including DEA agents. It is also based upon my personal involvement in this investigation and on my training and experience. In submitting this affidavit, I have not included each and every fact known to me about the investigation, but instead have included only those facts that I believe are sufficient to establish the forfeitability of the Currency.

## II. BACKGROUND REGARDING VYRACK SOK CHHEM

9. Along with other law enforcement agents, I am participating in an investigation into drug trafficking crimes, including crimes in violation of Title 21, United States Code, Sections 841 and 846, and money laundering crimes, including crimes in violation of Title 18, United States Code, Section 1956(h), by Vyrack Sok Chhem ("Chhem") and other identified and unidentified individuals of the criminal street gang known as the Asian Boyz (hereinafter, the "ABZs"), and others.

10. Chhem is a self-identified member of ABZ, and Chhem is often found in the company of other self-identified members of the ABZ, including individuals that have been convicted of serious felony drug offenses and violent crimes.

## III. BACKGROUND OF THE BULK CURRENCY PICKUP

11. Drug traffickers typically deal in cash and, as a result, generate large sums of currency. Once drug money is generated, drug traffickers need to spend, transport, convert, or conceal that cash. Based on my training and experience, drug traffickers often aggregate drug proceeds (cash) and then transport it at one time, often paying others to do so. Undercover bulk currency pickups are utilized by law enforcement to identify the scope and magnitude of these Transnational Drug Trafficking Organizations (DTOs). Bulk currency pickups are often utilized by law enforcement to exploit the DTO as well as ascertain the route and origin of drug proceeds for further investigation and/or seizure. In short, undercover bulk currency pickups occur when

4

an undercover member of law enforcement infiltrates the drug traffickers' attempts to move cash drug proceeds.

12. CS is a DEA Cooperating Source, whose identity is known to DEA supervisors and their controlling agents. CS has provided information in the past that led to multiple seizures of drug proceeds, totaling approximately seven million dollars in United States currency. CS has also provided information in the past to DEA that resulted in the large scale seizure of heroin on multiple occasions. The total amount of heroin seized by law enforcement as a result of information provided by CS exceeded over 20 kilograms. CS has provided information in the past to law enforcement that resulted in the large scale seizure of cocaine on multiple occasions. The total amount of cocaine seized as a result of information provided by CS exceeded 50 kilograms. CS has provided information in the past that led to the discovery and dismantling of a methamphetamine production facility. CS has provided information in the past that directly led to the arrest of over 100 persons, for violations of the Controlled Substance Act. CS has provided information to law enforcement in the past that led to the conviction of over five individuals for violations of the Controlled Substance Act. It is the consensus of DEA supervisors and controlling agents that if the true identity of CS was divulged, the physical safety of CS and his/her family would be at substantial risk.

## IV. ARRANGEMENT OF THE DRUG MONEY PICKUP

13. During the week of September 23, 2017, CS reported that a Boston based money courier was safeguarding drug proceeds belonging to a person CS identified as the leader of the drug trafficking organization, Cartel de Jalisco Nueva Generación ("CJNG"). At times, for purposes of operational security, CS does not report directly to law enforcement but, instead, communicates through a second DEA Cooperating Source, whom DEA also believes to be

5

reliable.

14. The DEA in another state,[2] began to acquire intelligence from CS and, based upon conversations between CS and a Mexico based money broker, an individual in the Boston area was attempting to launder approximately $300,000 in United States currency believed to be drug proceeds. CS reported that the Boston based money courier was in possession of drug proceeds belonging to the leader of the CJNG drug cartel.

15. In late September, 2017, via an intermediary, CS supplied a target telephone number (###)###-2477 (for the Boston based money mule). Anticipating a $300,000 bulk cash drug money pickup in Boston, the DEA agents in the other state requested assistance from the DEA in Boston. Along with other information about the pickup, the DEA agents in the other state were provided a specific code phrase, to be utilized by the undercover agent/officer when negotiating the pick-up to confirm that individual's identity to the money carrier.

16. On September 26, 2017, DEA TFO Luis Rodriguez, acting in an undercover capacity, utilized the provided number, (###)###-2477, and the code-phrase and made contact with an unknown male, later identified as Chhem. TFO Rodriguez posed as an individual that could pick up bulk currency from Chhem in Boston and deliver it to the CJNG drug cartel.

17. After providing the code phrase, Chhem told TFO Rodriguez that Chhem would prefer to meet the following day. Chhem indicated that he did not like to do "these things at night". Chhem said that he lived in the area of Dracut, near the Lowell line. TFO Rodriguez said that he was unfamiliar with that area and Chhem offered to travel for TFO Rodriguez. TFO Rodriguez confirmed with Chhem that Chhem would be ready to consummate the pick-up the next day, and Chhem said he had "the whole 300."

---

[2] The DEA agents that interacted with the CS are based somewhere other than Massachusetts. The city and state are not identified for purposes of further protecting the identity of the CS.

6

18. The next day, TFO Rodriguez made multiple unsuccessful attempts to contact Chhem by phone. Then, at approximately 3:33 PM, Chhem called TFO Rodriguez and said he was ready to meet. TFO Rodriguez and Chhem agreed to meet in a Home Depot parking lot in Somerville, Massachusetts.

19. During multiple phone conversations with Chhem, TFO Rodriguez observed that Chhem appeared to be speaking in a Southeast Asian dialect. Chhem was anxious to consummate the $300,000 transfer and offered TFO Rodriguez an additional $1,000 bonus if TFO Rodriguez would commit to meeting later that day. Chhem told TFO Rodriguez that he would be driving a grey Audi A4.

20. In anticipation of the anticipated transaction, multiple DEA Agents, Task-Force Officers, Massachusetts State Troopers, and Somerville Police Officers assembled in the area of the Home Depot in Somerville. At approximately 6:33 PM, Chhem called TFO Rodriguez and told him that he had arrived at the Home Depot. At approximately 6:35 PM, I saw a grey Audi A4, Massachusetts license plate 2KZ142,[3] driven by a young Asian male, later identified as Chhem, enter the Home Depot parking lot. The Audi A4 drove towards the front entrance of the Home Depot slowly.

21. TFO Scott Brown observed the Audi park and saw Chhem exit the vehicle and enter the Home Depot. TFO Rodriguez continued to engage in phone conversation with Chhem and learned that the $300,000 was in the Audi. Approximately fifteen minutes later TFO Brown observed Chhem exit the Home Depot and walk back towards the Audi. TFO Rodriguez, called Chhem and cancelled the money pick-up.

---

[3] The vehicle is registered to a known member of the ABZ and associate of VYRACK SOK CHHEM, in Lowell, Massachusetts.

22. I saw Chhem use his cell phone and look all around the parking lot as he walked back towards the Audi. Approximately ten minutes later, TFO Brown observed the Audi drive out of the Home Depot parking area towards the Assembly Square Marketplace. Surveillance units continued to follow Chhem in the Audi as he drove into and around a small rotary, completing a full-circle around the rotary. Chhem then made a quick series of turns without signaling, into and out of parking spaces in the adjacent area. In my experience, Chhem's driving was consistent with someone attempting to identify and frustrate police surveillance because erratic driving can make it more obvious to the erratic driver if they are being followed. Despite Chhem's attempts, surveillance of the Audi continued for the next 20 to 30 minutes, during which Chhem continued to periodically move into and out of multiple parking spaces within the parking area of the Assembly Square Marketplace.

23. A short time later, Chhem pulled into the opposite side of the Assembly Square Marketplace parking area, near a Starbucks. Chhem drove the Audi towards the rear of the Starbucks and then quickly reversed direction, ultimately parking in a space facing the front of the Starbucks. These tactics are also consistent with counter surveillance techniques designed to detect and foil police surveillance. TFO Brown observed Chhem enter the Starbucks and look out towards the parking area intently.

24. During surveillance that day, agents saw that the Audi had an expired inspection sticker and an inoperable license plate light, each a traffic infraction under Massachusetts law. Approximately five minutes later, TFO Brown observed Chhem exit the Starbucks and walk towards the Audi. I observed Chhem place an item in the trunk. Investigators followed Chhem as he drove away and got onto Interstate 93 North. Chhem was also speeding.

**V. THE TRAFFIC STOP AND RECOVERY OF THE CURRENCY**

25. Massachusetts State Police Trooper David Lucas initiated a traffic stop, approached the vehicle, and observed that Chhem was its sole occupant. Chhem was extremely nervous, his hands were shaking and his breathing was very rapid. Trooper Lucas observed three cellular phones in the center console of the Audi. Trooper Lucas requested and received consent to search the vehicle.

26. A subsequent search of the Audi revealed approximately $6,000 in a small blue duffel bag in the rear passenger compartment. A search of the trunk revealed a larger blue duffel bag containing approximately $300,000. The approximately $300,000 in the larger blue duffel bag was heat-sealed, and the Currency was formed in a brick like manner. In my experience, narcotics traffickers often package their drug proceeds in this manner to attempt to avoid detection by police K-9s. An additional sum of United States currency totaling approximately $1,000, consistent with the bonus promised to TFO Rodriguez on the telephone, was discovered on Chhem. The Currency was taken into custody by the DEA and later forwarded to the United States Marshals Service in Boston for safekeeping.

27. Based on my training and experience, the events here, including the recorded phone calls, Chhem's counter-surveillance, and the packaging and location of the bulk currency in the vehicle are consistent with narcotics trafficking and attempts to launder narcotics proceeds.

28. DEA Special Agent Garth Hamelin and DEA TFO Brown interviewed Chhem regarding the origin of the currency discovered in the vehicle and on his person. Initially, Chhem indicated that he did not know there was cash in the trunk of the Audi and he did not know how it got there. Later, however, Chhem claimed that the currency represented his winnings from casino gambling. Chhem was asked if he possessed any receipts regarding his

reported casino winnings and that he did not. Chhem also said that he did not remember exactly where he won the money.

## VI. CONCLUSION

29. Based on my training and experience, and the facts described herein, I respectfully submit that probable cause exists to believe that the Currency is subject to forfeiture because it represents moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of Title 21, United States Code, Sections 841, and/or 846; and/or represents proceeds traceable to an exchange in violation of Title 21, United States Code, Sections 841, and/or 846, and/or represent all moneys, negotiable instruments, and securities used or intended to be used to facilitate violations of Title 21, United States Code, Sections 841, and/or 846.

Signed under the pains and penalties of perjury, this ___26th___ day of February, 2018.

Shaun T. Santos
Task Force Officer
Drug Enforcement Administration